**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

THE SHERWIN-WILLIAMS CO.   *
           *
   v.       * Civil Action WMN-07-2918
           *
COACH WORKS AUTO COLLISION *
REPAIR CENTER, INC. <u>et al.</u> *

 *  *  *  *  *  *  *  *  *  *  *  *

## <u>MEMORANDUM</u>

Pending before the Court are four motions: (1) Plaintiff Sherwin-Williams Company's (Sherwin-Williams) Motion for Partial Summary Judgment, ECF No. 77; (2) Sherwin-Williams' Motion for Default Judgment Against Defendant M&M Collision Experts, Inc. (M&M Collision), ECF No. 90; M&M Collision's Motion to Set Aside Default, ECF No. 96; and a motion for leave to file an Amended Answer by Defendants Coach Works Auto Collision (Coach Works) and Michael Green (Green), ECF No. 100. All four motions are ripe for review. Upon review of the pleadings and applicable case law, the Court determines that no hearing is necessary, Local Rule 105.6, and that: (1) Sherwin-Williams' motion for default judgment will be denied; (2) M&M Collision's motion to set aside default will be granted; (3) Coach Works and Green's motion to file an amended answer will be granted; and (4) Sherwin-Williams' partial summary judgment motion will be granted in part and denied in part.

## I. **BACKGROUND**

At its core, this is a simple breach of contract case. In
December 2006, Vince's Body Shop (the Body Shop), an automotive
collision repair center, agreed to purchase all of its
automotive paint supplies from Sherwin-Williams for a period of
five years. Five months later, the Body Shop stopped buying its
paint supplies from Sherwin-Williams, and Sherwin-Williams sued.

Straightforward though it may seem, both the facts of this
case and its litigation history have conspired to render it
otherwise. To begin with, the Body Shop is not and never was a
legal entity. Rather, "Vince's Body Shop" was initially the
trade name of Coach Works, a business owned by Vince Julio
(Julio). In 2004, Julio decided to sell all the assets of
Vince's Body Shop to his long-time employee Michael Green. To
facilitate the purchase, Green and his wife formed M&M
Collision. In turn, M&M Collision, owned by Green, entered into
an asset purchase agreement (Purchase Agreement) with Coach
Works, owned by Julio. Under the Purchase Agreement, M&M
Collision agreed to buy the Body Shop's assets from Coach Works
for $250,000, payable via installments over several months.
Although the Body Shop's assets would not transfer to M&M
Collision until M&M Collision remitted its final payment, Julio
and Green agreed that Green and M&M Collision would operate,
manage, and receive the profits from the Body Shop in the
interim. In January 2007, M&M Collision remitted its final

payment to Coach Works, and all Body Shop assets transferred to M&M Collision.  Thereafter, M&M Collision continued to operate "Vince's Body Shop" as such.

Though ownership of the Body Shop changed in January 2007, little else did.  Because Green had been managing the Body Shop since 2004, the ownership transition was seamless.  Green merely continued operating the Body Shop the same way he had prior to the asset transfer.  Moreover, M&M Collision agreed to assume all of Coach Works' liabilities.  In this way, Vince's Body Shop continued to operate and interact with its customers and suppliers exactly as it did prior to the asset transfer.

On December 7, 2006, just prior to the completion of the transition, Coach Works entered into a supply agreement with Sherwin-Williams, pursuant to which Coach Works agreed to purchase all of its automotive paint and finishing products exclusively from Sherwin-Williams for a period of five years (Supply Agreement).[1]  In return, Sherwin-Williams agreed to sell its products at a discounted rate and to give Coach Works a $45,000 advance (Advance) toward the purchase of its automotive paint requirements.  Green signed the agreement on behalf of

---

[1] The Supply Agreement was with Sherwin-Williams Automotive Finishes Corporation.  On December 31, 2009, that entity merged into the Sherwin-Williams Company.  The Sherwin-Williams Company replaced Sherwin-Williams Automotive Finishes Corporation as Plaintiff by this Court's Order of March 4, 2010.  See ECF No. 70.

"Coach Works Auto Collision Repair Center, Inc. dba Vince's Body Shop" and listed his title as Owner/President. Supply Agreement 1, ECF No. 72-1. At the same time, Green signed a personal guaranty "absolutely, irrevocably and unconditionally guarantee[ing] the prompt and complete payment and performance by [Coach Works] of all of [its] obligations to Sherwin-Williams under the Supply Agreement." Guaranty ¶ A, ECF No. 72-2.

Green, however, was neither the owner nor the president of Coach Works in December 2006. Rather, he was merely the manager of the Body Shop. At the same time, Green was also the owner of M&M Collision, but M&M Collision did not complete its purchase of the Body Shop until January 2007. Notwithstanding the confusion, the Body Shop started purchasing all its paint and related supplies from Sherwin-Williams pursuant to the Supply Agreement. The Body Shop did so first as the trade name of Coach Works in December 2006 and January 2007, and then as the trade name of M&M Collision in January 2007 and thereafter. Green never notified Sherwin-Williams that the Body Shop was operating under new ownership, and Sherwin-Williams continued to receive payment for its supplies from the same bank account. Thus, Sherwin-Williams was entirely unaware that the Body Shop was no longer owned by Coach Works after January 2007.

In April 2007, M&M Collision entered into a new paint supply agreement with FinishMaster Automotive and Industrial

Paint (FinishMaster), a competitor of Sherwin-Williams, and

FinishMaster provided M&M Collision with an advance of $110,000.

M&M Collision then ceased purchasing its paint requirements from

Sherwin-Williams.  Shortly thereafter, Sherwin-Williams learned

of M&M Collision's agreement with FinishMaster and initiated

this action.

## II.  PROCEDURAL POSTURE

Sherwin-Williams' initial Complaint named only Coach Works

and Green as defendants and alleged only breach of contract and

unjust enrichment.  It did not name M&M Collision.  In January

2009, Sherwin-Williams moved for partial summary judgment on the

breach of contract claim.  In response to questions raised by

the Court, Sherwin-Williams moved to amend its Complaint, and

the Court granted its motion on March 4, 2010.  In so doing, the

Court also denied Sherwin-Williams' first motion for partial

summary judgment as moot.  The Amended Complaint added M&M

Collision as a defendant to the breach of contract and unjust

enrichment counts and further added a claim for fraud against

M&M Collision and Green.

In contrast to M&M Collision, both Coach Works and Green

were actively engaged in this litigation from the outset, and

they promptly filed an Answer to the Amended Complaint (First

Green/Coach Works Answer) on March 15, 2010, through their

attorney at the time, Jeffrey N. Pritzker.  On May 28, 2010,

Sherwin-Williams then filed the instant motion for partial summary judgment on Counts I and II of the Amended Complaint, which allege breach of the Supply Agreement against Coach Works and M&M Collision and breach of the Guaranty against Green. ECF No. 77.

At that stage, M&M Collision had not yet been served with a summons and copy of the Amended Complaint and was not yet a party to this action. Although Sherwin-Williams named M&M Collision as a defendant when it filed its Amended Complaint on March 4, 2010, Sherwin-Williams did not cause a summons to be served upon M&M Collision until June 16, 2010. By then, Mr. Pritzker, who likely would have represented M&M Collision, had withdrawn as counsel to Coach Works and Green.[2] Green, now without counsel for himself, Coach Works or M&M Collision, was then forced to file an answer pro se on behalf of M&M Collision, which he attempted to do via a handwritten letter dated July 1, 2010 (First M&M Collision Answer). ECF No. 84. Though Green and Coach Works had already filed the First Green/Coach Works Answer, the First M&M Collision Answer purported to respond for Green and Coach Works as well. Local Rule 101.1, however, requires that all corporations be represented by counsel. Sherwin-Williams thus moved to strike the First M&M Collision

---

[2] Mr. Pritzker filed a motion to withdraw as counsel to Coach Works and Green on May 11, 2010, ECF No. 75, and this Court granted his motion on June 14, 2010, ECF No. 78.

Answer with respect to M&M Collision—but not with respect to Coach Works or Green—and this Court was compelled to grant its motion on August 2, 2010.

Unable to obtain counsel for M&M Collision, Green was also unable to properly file a new answer on M&M Collision's behalf. As a consequence, Sherwin-Williams moved for default judgment against M&M Collision on August 10, 2010, ECF No. 90, and the Clerk of the Court entered default against M&M Collision on August 16, 2010. Via correspondence with the Court, Green indicated he was actively seeking counsel for all parties in the action, so the Court granted M&M Collision an extension until October 6, 2010, to file an Answer to the Amended Complaint and to respond to Sherwin-Williams' motions for default judgment and partial summary judgment.

On the evening of October 6, 2010, Defendants' current attorney, Steven Freeman, timely filed three documents: (1) an appearance on behalf of Coach Works, Green and M&M Collision, ECF No. 95; (2) a motion to set aside default on behalf of M&M Collision, ECF No. 96, in which M&M Collision also requested leave to file an Answer to the Amended Complaint (Second M&M Collision Answer); and (3) an opposition to Sherwin-Williams' motion for partial summary judgment, ECF No. 97. Later, on December 30, 2010, Coach Works and Green filed a motion for leave to file an Amended Answer to the Amended Complaint (Second

Green/Coach Works Answer).  ECF No. 100.  All four pending

motions are opposed by the non-moving party or parties.

### III. SHERWIN-WILLIAMS' MOTION FOR DEFAULT JUDGMENT AND M&M

### COLLISION'S MOTION TO SET ASIDE DEFAULT

When the Court granted Sherwin-Williams' motion to strike

the First M&M Collision Answer on August 2, 2010, the Court also

ordered M&M Collision to file an answer through an attorney by

August 6, 2010.  ECF No. 89.  M&M Collision did not comply.

Based upon M&M Collision's failure, Sherwin-Williams filed a

motion for default judgment on August 10, 2010, ECF No. 90, and

six days later the Clerk of the Court made an entry of default

against M&M Collision, ECF No. 91.

On October 6, 2010, M&M Collision's new attorney filed a

motion to set aside default, which effectively opposed Sherwin-

Williams' motion for default judgment.[3]  ECF No. 96-1.  M&M

Collision argued that it caused no prejudicial delay, that it

had meritorious defenses to Sherwin-Williams' allegations, and

that it should therefore be granted leave to file the Second M&M

Collision Answer to the Amended Complaint.  Regarding the

alleged defenses, M&M Collision claimed both that it was

fraudulently or negligently induced to sign the Supply

Agreement, and that it was justified in rescinding the Supply

---

[3] M&M Collision did not, however, file a direct opposition to
Sherwin-Williams' motion for default judgment.

Agreement based upon Sherwin-Williams' failure to deliver paint products of acceptable quality. Sherwin-Williams opposed M&M Collision's motion chiefly by arguing that M&M Collision's alleged defenses lacked merit and that allowing M&M Collision to file the Second M&M Collision Answer would be unduly prejudicial.

Federal Rule of Civil Procedure 55(c) provides that a "court may set aside an entry of default for good cause." Courts must consider several factors to determine whether Rule 55(c) good cause exists, including, inter alia: whether the defendant moving to set aside default acted with reasonable promptness; whether the plaintiff will be substantially prejudiced if the default is set aside; and whether the defendant has a meritorious defense. Mezu v. Morgan St. Univ., Cov. No. 09-WMN-2855, 2010 WL 1068063, *6 (D. Md. Mar. 18, 2010) (citing Consol. Masonry & Fireproofing, Inc. v. Wagman Const. Corp., 383 F.2d 249, 251 (4th Cir. 1967); United States v. Moradi, 673 F.2d 725, 727-28 (4th Cir. 1982); and Lolatchy v. Arthur Murray, Inc., 816 F.2d 951, 953 (4th Cir. 1987)). Moreover, courts should liberally construe Rule 55(c) "in order to provide relief from the onerous consequences of defaults and default judgments." Tolson v. Hodge, 411 F.2d 123, 130 (4th Cir. 1969).

In this case, Green acted reasonably in his efforts to litigate this case and secure counsel for M&M Collision. First, Green attempted to file an answer for M&M Collision pro se, and when that failed he kept the Court apprised of his efforts to comply with the Court's Orders. Given Green's responsiveness and the relatively short delay caused by M&M Collision's lack of counsel, Sherwin-Williams was not substantially prejudiced by M&M Collision's default. Arguably, Sherwin-Williams' own delay in causing a summons and the Amended Complaint to be served on M&M Collision was partially responsible for this dilemma. These factors weigh in favor of granting M&M Collision's motion to set aside default.

Whether M&M Collision has a meritorious defense under the standard employed in a Rule 55(c) decision requires a measure of additional analysis. In this context, "all that is necessary to establish the existence of a 'meritorious defense' is a presentation or proffer of evidence, which if believed, would permit either the Court or the jury to find for the defaulting party." Moradi, 673 F.2d at 727. "The underlying concern is whether there is some possibility that the outcome . . . after a full trial will be contrary to the result achieved by the default." Mezu, 2010 WL 1068063 at *7 (internal quotations omitted).

Sherwin-Williams alleges breach of contract (Count I), unjust enrichment (Count III) and fraud (Count IV) against M&M Collision, so a default judgment would render M&M Collision liable for all three counts. As a defense to these claims, M&M Collision points to Green's deposition testimony regarding the initial execution of the Supply Agreement, among other things, as evidence that Green—and therefore M&M Collision—was fraudulently induced to sign the Supply Agreement.

To sustain its claim for fraud against M&M Collision, Sherwin-Williams would have to establish:

> (1) that [M&M Collision] made a false representation to [Sherwin-Williams], (2) that its falsity was either known to [M&M Collision] or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding [Sherwin-Williams], (4) that [Sherwin-Williams] relied on the misrepresentation and had the right to rely on it, and (5) that [Sherwin-Williams] suffered compensable injury resulting from the misrepresentation.

VF Corp. v. Wrexham Aviation Corp., 715 A.2d 188, 193 (Md. 1998) (emphasis added). Sherwin-Williams' Amended Complaint alleges that M&M Collision, through Green's actions, intentionally misled Sherwin-Williams into believing Green was the owner of Coach Works to induce Sherwin-Williams to sign the Supply Agreement.

The parties do not dispute that when the Supply Agreement was consummated in December 2006, Coach Works owned Vince's Body

Shop.  At the same time, Green was the manager of the Body Shop and had authority to bind Coach Works in contractual obligations.  The Body Shop needed automotive paint supplies, and Green testified he signed the Supply Agreement to secure "a product that [he] was going to have for a long period of time." Green Dep. 27:4-8, Feb. 5, 2008, ECF No. 96-2.  Given this evidence of Green's purpose for the Supply Agreement, it is possible a reasonable jury could find that Green—and M&M Collision—lacked the requisite intent to defraud Sherwin-Williams.  As this result would differ from the result achieved by a default judgment, M&M Collision has proffered evidence sufficient to raise a meritorious defense.

In opposition, however, Sherwin-Williams argues that if the Court were to set aside the default and permit M&M Collision to file the Second M&M Collision Answer, Sherwin-Williams would be unduly prejudiced because the proposed answer diverges from representations Defendants made in both the First Green/Coach Works Answer and the First M&M Collision Answer.  The First M&M Collision Answer, however, has no legal effect.  The Court granted Sherwin-Williams' motion to strike the answer as it related to M&M Collision, but neither Green nor Coach Works, both of whom had already filed the First Green/Coach Works Answer, moved to amend their Answer.  Thus, the First M&M Collision Answer was never properly filed on behalf of any

Defendants.  Moreover, Sherwin-Williams' alleged reliance on the
First M&M Collision Answer, which was filed <u>pro se</u> and scribbled
in slanted handwriting on wide-ruled notebook paper, strains
credulity.  Green's efforts to answer on behalf of M&M Collision
are laudable, but responding to allegations in a complex legal
dispute is difficult.  That Sherwin-Williams is partially
responsible for creating the confusion by failing to promptly
serve a summons and copy of the Amended Complaint on M&M
Collision further subverts its claim of undue prejudice.

While the legal positions outlined in the First Green/Coach
Works Answer and the Second M&M Collision Answer may diverge,
M&M Collision is its own legal entity and a separately named
defendant.  Though the Defendants' collective interests may
overlap, M&M Collision has not yet filed an answer of any sort
thus far.  Sherwin-Williams cannot sustain an argument that it
would be prejudiced if one of the defendants it chose to join is
permitted to file an answer as required by the rules of civil
procedure.  Finally, to the extent the Second M&M Collision
Answer creates any uncertainty about the Defendants' legal
positions, such inconsistencies will be addressed below in Green
and Coach Works' motion to file the Second Green/Coach Works
Answer.  Thus, M&M Collision's motion to set aside default will
be granted, M&M Collision will be permitted to file its Second

M&M Collision Answer, and Sherwin-Williams' motion for default judgment will be denied.

## IV. COACH WORKS AND GREEN'S MOTION TO FILE AN AMENDED ANSWER

After this Court granted Sherwin-Williams leave to file its Amended Complaint, Green and Coach Works filed their First Green/Coach Works Answer through Mr. Pritzker. Mr. Pritzker then withdrew from this case, and subsequently Mr. Freeman agreed to represent all three defendants. Upon a review of the evidence thus far established, Mr. Freeman drafted an answer for M&M Collision (Second M&M Collision Answer) based upon his theory of the case. Now, Coach Works and Green move to file an Amended Answer to the Amended Complaint (Second Green/Coach Works Answer) to remove any ambiguity caused by differences between the First Green/Coach Works Answer and the Second M&M Collision Answer.

Pursuant to Federal Rule of Civil Procedure 15(a)(2), "[t]he Court should freely give leave [to parties to amend their pleadings] when justice so requires." Courts should deny motions to amend only if: (1) the amendment would prejudice the opposing party; (2) the amendment would be futile; or (3) the movant has engaged in bad faith or undue delay. Foman v. Davis, 371 U.S. 178, 182 (1962). In opposition, Sherwin-Williams reiterates its earlier argument that further amendment of the pleadings would cause undue prejudice, because it would

exacerbate the confusion caused by inconsistencies among the First Green/Coach Works Answer, the Second M&M Collision Answer, and the proposed Second Green/Coach Works Answer. Yet, it is precisely these inconsistencies the Defendants seek to mollify by filing the Second Green/Coach Works Answer, so Sherwin-Williams' claim of prejudice is not persuasive.

Sherwin-Williams also submits that, given the lengthy procedural history of this litigation, allowing yet another pleadings amendment would be unjust. This case has indeed taken many unexpected twists, but all parties are in part responsible for the various divergences, and all parties have at times benefitted from them. By allowing Green and Coach Works to file an Amended Answer, this case will finally reach a solid procedural posture from which it can be adjudicated on the merits. Thus, Green and Coach Works' motion will be granted.

## V.    SHERWIN-WILLIAMS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Sherwin-Williams has moved for partial summary judgment regarding Count I, breach of contract against Coach Works and M&M Collision, and Count II, breach of contract against Green. ECF No. 77.

### A.   Legal Standard

Summary judgment is proper if the evidence before the court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that

15

there is no genuine issue of material fact and that the moving
party is entitled to judgment as a matter of law.  Fed. R. Civ.
P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A
party seeking summary judgment bears the initial responsibility
of informing the court of the basis of its motion and
identifying the portions of the opposing party's case which it
believes demonstrate the absence of a genuine issue of material
fact.  Id. at 323.  The non-moving party, in order to withstand
the motion for summary judgment, must produce sufficient
evidence to demonstrate the existence of a triable issue of
fact.  Celotex, 477 U.S. at 324.  The mere existence, however,
of some factual dispute is insufficient to defeat a motion for
summary judgment; there must be a genuine issue of material
fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48
(1986).  At all times, the non-moving party is entitled to have
"all reasonable inferences . . . drawn in its respective favor."
Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1129 (4th Cir.
1987).

### B.  Coach Works' Liability Under the Supply Agreement

Defendants do not dispute that Coach Works was initially
liable under the Supply Agreement, as Green signed the contract
on behalf of Coach Works with the authority to do so.  Coach
Works previously argued, however, that its obligations
extinguished once it sold the assets of Vince's Body Shop to M&M

Collision. That is correct. As discussed further below, Coach Works' obligations transferred to M&M Collision upon the closing of the Purchase Agreement, such that Coach Works had no continuing obligations under the Supply Agreement beyond those incurred while Coach Works still owned the Body Shop.

That does not, however, absolve Coach Works of all liability. The Supply Agreement includes an Acceleration Clause for the repayment of the $45,000 Advance upon the occurrence of certain events. The agreement provides: "[Coach Works] shall pay the entire amount of the Advance to Sherwin-Williams, without notice or demand . . . if [Coach Works] sells or otherwise disposes of all or a substantial portion of any Body Shop's [sic] business or assets." Supply Agreement ¶ 5, ECF No. 72-1. Pursuant to the Purchase Agreement, Coach Works sold substantially all of the Body Shop's assets to M&M Collision, thereby triggering the Acceleration Clause. As such, Coach Works is liable for the repayment of the $45,000 Advance.[4]

---

[4] In Coach Works' opposition to Sherwin-Williams' first partial summary judgment motion, which was denied as moot when Sherwin-Williams amended its Complaint, Coach Works implied in a footnote that it cannot be sued because it is defunct. ECF No. 61 at 1 fn.1. Coach Works never expounded upon that argument and did not raise it in opposition to the instant partial summary judgment motion. As Green personally guaranteed Coach Works' performance under the Supply Agreement, Sherwin-Williams can recover for Coach Works' breach from Green (see infra). Thus, Coach Works' capacity to be sued is a moot issue and need not be addressed by the Court.

Green does not dispute the necessity of reimbursing Sherwin-Williams for the Advance. In fact, he testified at his deposition that he tried to repay the Advance at least three times prior to the initiation of these legal proceedings, but Sherwin-Williams refused to accept it. In their opposition to this motion, however, Defendants argue they were fraudulently induced to sign the Supply Agreement by material misrepresentations made by Sherwin-Williams regarding the quality of Sherwin-Williams' paint products.[5] As the Supply Agreement was obtained through fraud, Defendants argue, M&M Collision was justified in rescinding the contract once it learned of Sherwin-Williams' alleged misrepresentations.

To establish a defense of fraudulent inducement under Ohio law,[6] a defendant must show: (1) a false representation concerning a fact or, in the face of a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or utter disregard for its truthfulness; (3) intent to induce reliance on the representation; (4) justifiable reliance upon the

_____

[5] Defendants' opposition to this motion was filed on behalf of Green and M&M Collision only. In the interest of justice and given the confusing posture of this case, however, the Court will construe the arguments as raised on behalf of Coach Works as well.

[6] The Supply Agreement stipulates it will be governed by the laws of Ohio. Supply Agreement ¶ 9, ECF No. 72-1.

representation under circumstances manifesting a right to rely;
and (5) injury proximately cause by the reliance. <u>Lepera v.
Fuson</u>, 613 N.E.2d 1060, 1063 (Ohio Ct. App. 1992).  In support
of their argument, Defendants point to Green's deposition,
affidavit, and interrogatory responses.

All three documents submitted in support of Defendants'
claim are replete with evidence that Sherwin-Williams' knew the
Body Shop was having difficulty working with Sherwin-Williams'
products.  The problems included trouble matching the color of
the new paint with the color of the existing paint on the cars,
severely prolonged paint-drying times, paint contamination as a
result of the prolonged drying times, mottling, and difficulty
achieving a consistent paint mixture.  The evidence also
indicates both Green and the Body Shop's painters informed Chris
Dolan, Sherwin-Williams' Sales Representative, of their problems
on several occasions, such that Sherwin-Williams sent paint
technicians to the Body Shop to try to cure the issues.  In
fact, by March 2007, Green and Dolan discussed Green's
complaints "every day."  Green Dep. 79:2-4, ECF No. 96-2.  Last,
Green notes in his affidavit that, presumably after he
encountered difficulty with Sherwin-Williams' paint, he reviewed
over forty different formal, written complaints against Sherwin-
Williams filed by other automotive paint shops in Maryland and

Virginia discussing similar or identical difficulties with
Sherwin-Williams' products.

While the Defendants' submissions indicate strongly that
Sherwin-Williams' knew of the Body Shop's difficulties,
Defendants have submitted nothing to establish that Chris Dolan
or anyone else from Sherwin-Williams made false statements with
the intent to mislead and induce Defendants to sign the Supply
Agreement.  Fraud in the inducement requires a showing of
misrepresentations made prior to consummation of the contract.
Even if Sherwin-Williams was aware of the complaints about the
quality of its paint lodged by other automotive paint shops
before it negotiated the Supply Agreement, there is no evidence
Sherwin-Williams made any representations denying or
inconsistent with those complaints.  Notably, the Supply
Agreement itself explicitly disclaims both an implied warranty
of merchantability and an implied warranty of fitness for a
particular purpose.  In short, Defendants have submitted no
evidence Sherwin-Williams made any misrepresentations regarding
the quality of its products prior to consummation of the Supply
Agreement, which also means there is no evidence that Sherwin-
Williams fraudulently induced Defendants to sign the Supply
Agreement through false misrepresentations.  As such,
Defendants' attempted defense via fraud in the inducement fails
to raise a genuine dispute of material fact, and Sherwin-

Williams is entitled to summary judgment against Coach Works for the $45,000 Advance.

### C. Green's Liability Under the Guaranty Agreement

Sherwin-Williams next claims Green guaranteed that the Body Shop would promptly and completely perform under the Supply Agreement. Sherwin-Williams also argues the Court should effectuate the "plain language" of the Guaranty to hold Green personally liable for "the full amount that is due and payable" under the Supply Agreement, including not only the $45,000 Advance, but also any consequential damages owed pursuant to any further breach.

The Guaranty provides:

> For and in consideration of the agreement of Sherwin-Williams Automotive Finishes Corp. ("Sherwin-Williams") to extend credit to Coach Works Auto Collision Repair Center, Inc., dba Vince's Body Shop ("Customer"), the undersigned, Michael Green ("Guarantor"), hereby absolutely, irrevocably and unconditionally guarantees the prompt and complete payment and performance by Customer of all of Customer's obligations to Sherwin-Williams under the Supply Agreement by and between Customer and Sherwin-Williams . . . . Upon failure by Customer to pay to Sherwin-Williams the full amount that is due and payable . . . , Guarantor shall pay to Sherwin-Williams upon demand the full amount that is due and payable.

Guaranty ¶ A, ECF No. 72-2 (emphasis added). Green, as Guarantor, guaranteed payment of all obligations incurred by the "Customer," which was defined as Coach Works. Coach Works, as discussed above, is liable for the repayment of the $45,000

Advance but nothing more.  Green is therefore personally liable

for the Advance, but Green's liabilities under the Guaranty

extend no further, and they do not cover any liabilities

incurred by M&M Collision.  As such, Sherwin-Williams is

entitled to summary judgment on Count II of its Amended

Complaint.

### D.   M&M Collision's Legal Responsibility Under the Supply Agreement

Although the Supply Agreement was entered into by Coach

Works, Sherwin-Williams argues that M&M Collision is legally

responsible for its performance and breach either by virtue of

novation or via corporate successor liability.  A claim for

novation must allege four elements: (1) a previous valid

obligation; (2) the consent of all parties to the new contract;

(3) valid consideration for the new contract; and (4) the

extinguishment of the old contract by the new one.  Dahl v.

Brunswick Corp., 356 A.2d 221, 227 (Md. 1976) (internal

citations omitted); McGlothin v. Huffman, 640 N.E.2d 598, 601

(Ohio Ct. App. 1994).[7]  "A novation is never presumed; the party

asserting it must establish clearly and satisfactorily that

there was an intention, concurred in by all parties, that the

---

[7] Although the Supply Agreement states that it is to be governed
by Ohio law, both parties have cited Maryland law regarding M&M
Collision's liability for the Agreement.  The law of novation is
sufficiently similar in both states that the Court need not
distinguish between the two to address this motion's arguments.

existing obligation be discharged by the new obligation." <u>Dahl</u>, 356 A.2d at 227; <u>see also</u> <u>McGlothin</u>, 640 N.E.2d at 601.

Sherwin-Williams entered into the Supply Agreement with Coach Works, and the contract was valid between them. While M&M Collision continued to honor the Supply Agreement after the consummation of the Purchase Agreement, Sherwin-Williams never learned of the change in the Body Shop's ownership until well after the asset sale was completed. By Sherwin-Williams' own admission, the change in ownership was "seamless," and Sherwin-Williams was unaware of the existence of M&M Collision until Green and FinishMaster signed a new supply agreement in April 2007. Plf.'s Mot. Summ. J. 5. Necessarily, Sherwin-Williams could not have consented to a novation of the original Supply Agreement in January 2007, because it was unaware M&M Collision existed. As a valid novation requires the knowledge and consent of all parties, Sherwin-Williams cannot impute liability of the Supply Agreement to M&M Collision by virtue of novation.

Alternatively, Sherwin-Williams argues M&M Collision is the corporate successor of Coach Works. Generally, "[a] corporation which acquires all or part of the assets of another corporation does not acquire the liabilities and debts of the predecessor, unless: (1) there is an express or implied agreement to assume the liabilities; (2) the transaction amounts to a consolidation or merger; (3) the successor entity is a mere continuation or

reincarnation of the predecessor entity; or (4) the transaction was fraudulent, not made in good faith, or made without sufficient consideration." Nissen Corp. v. Miller, 594 A.2d 564, 565-66 (Md. 1991). Sherwin-Williams believes exceptions one and three capture M&M Collision.

The Purchase Agreement explicitly provides that "[M&M Collision] hereby agrees to indemnify and save [Coach Works] harmless from and against any and all claims, actions, debts, liabilities, or proceedings against Coach Works arising subsequent to the Closing." Purchase Agreement ¶ 14.2, ECF No. 72-3. The term "liabilities" includes all legal obligations. See Black's Law Dictionary (9th ed. 2009) (defining "liability" as "the quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy"). This express agreement by M&M Collision to assume all of Coach Works' legal obligations arising after the Purchase Agreement was consummated, coupled with M&M Collision's continued purchase of paint supplies pursuant to the Supply Agreement, indicates that M&M Collision impliedly assumed all of Coach Works' contracts as well. By virtue of the first exception to the general rule of successor non-liability, M&M Collision is liable for all of Coach Works' responsibilities. To the extent Coach Works was bound by the Supply Agreement, so too was M&M Collision.

## E.  M&M Collision's Alleged Breach of the Supply Agreement

Sherwin-Williams claims M&M Collision breached the Supply Agreement when M&M Collision stopped purchasing its paint supplies from Sherwin-Williams and started buying them from FinishMaster.  In opposition, M&M Collision argues it properly rescinded the Supply Agreement when Sherwin-Williams provided substandard paint products and thus failed to perform its obligations.  In reply, Sherwin-Williams avers that M&M Collision never properly notified Sherwin-Williams in writing of its complaints as required by the contract and by law, and therefore M&M Collision was not entitled to rescind the agreement.  It is undisputed that M&M Collision stopped accepting automotive finishing products from Sherwin-Williams in April 2007, well in advance of the five year termination date of the contract.  Whether M&M Collision was justified in doing so will determine M&M Collision's liability.

The Supply Agreement is primarily a "transaction in goods" to be governed by Ohio law, and therefore it is subject to the Ohio Uniform Commercial Code (UCC).  <u>See</u> Ohio Rev. Code Ann. § 1302.02.  The Ohio UCC imposes on all contracts falling within its purview an obligation of good faith in performance and enforcement.  Ohio Rev. Code Ann. § 1301.09.  Furthermore, all remedies provided by the Ohio UCC "shall be liberally administered to the end that the aggrieved party may be put in

as good a position as if the other party had fully performed."
Ohio Rev. Code Ann. § 1301.06.

Because M&M Collision assumed Coach Works' obligations
under the Supply Agreement, it agreed to obtain all its paint
requirements exclusively from Sherwin-Williams.  Under
requirements contracts like the Supply Agreement, the Ohio UCC
imposes a good faith obligation on the buyer to purchase and
promote the sale of the seller's goods.  Ohio Rev. Code Ann. §
1302.19.  Once the seller delivers the goods, the buyer may
choose to accept or, under certain circumstances, reject them.
The buyer's "acceptance of goods occurs when the buyer . . .
after a reasonable opportunity to inspect the goods signifies to
the seller that the goods are conforming."  Ohio Rev. Code Ann.
§ 1302.64.

On the other hand, if the goods provided by the seller
"fail in any respect to conform to the contract, the buyer may .
. . reject [the goods]."  Ohio Rev. Code Ann. § 1302.60.  To
effectuate the rejection, the buyer must "seasonably notif[y]
the seller" within a reasonable time after the delivery of the
goods.  Ohio Rev. Code Ann. § 1302.61.  When a seller's goods
are rejected as nonconforming and the time for performance has
not yet expired, "the seller may seasonably notify the buyer of
his intention to cure and may then within the contract time make
a conforming delivery."  Ohio Rev. Code Ann. § 1302.52.

Furthermore, if either party has reasonable grounds to believe the other will not perform, that party "may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return."  Ohio Rev. Code Ann. § 1302.67.  Thereafter, the aggrieved party may repudiate the contract if such assurance is not forthcoming. Id.  Notwithstanding any of these provisions, however, a party that wrongfully breaches a contract under the Ohio UCC is liable to the other for damages, which may include lost profits and incidental damages.  See Ohio Rev. Code Ann. §§ 1302.77, 1302.82; Miami Packaging Inc. v. Processing Systems, Inc., 792 F. Supp. 560, 566 (S.D. Ohio 1991).

Construing as the Court must all facts in favor of Defendants, Green's deposition testimony, affidavit and interrogatory answers show Sherwin-Williams' paint products did not color match or dry as M&M Collision anticipated.  This much is largely undisputed.  Whether these deficiencies rose to the level of nonperformance on behalf of Sherwin-Williams is unclear.  After all, the Supply Agreement specifically disclaimed implied warranties of merchantability and fitness for a particular purpose.  Moreover, Green admitted he never sought assurances from Sherwin-Williams or rescinded the Supply Agreement in writing.  Instead, he did so only verbally, albeit

on several occasions.  The Ohio UCC provides that when a contract explicitly bars amendment or rescission except by a signed writing, the contract cannot otherwise be amended or rescinded.  Ohio Rev. Code Ann. § 1302.12.

In contrast, notice of nonconformity or rejection of the goods by the buyer "need not be in any particular form and may be implied from conduct.  Kabco Equip. Specialists v. Budgetel, Inc., 440 N.E.2d 611, 614 (Ohio Ct. App. 1981).  In addition, once notified of the nonconformity, "[a] seller does not have unlimited time to cure non-conformities, nor does a buyer have to keep complaining forever."  Id.  Green complained several times, and Sherwin-Williams attempted to cure the alleged nonconformity by sending out technical support personnel, but Sherwin-Williams' efforts were unsuccessful.  Green also tried at least three times to verbally rescind the Supply Agreement and repay the $45,000 Advance, so Sherwin-Williams had ample notice of M&M Collision's displeasure.  Given these efforts, requiring a writing would elevate form over function and disserve the interests of justice.  Finally, Green, who has worked with automotive paint companies for several years, testified he has never encountered difficulties of this magnitude with other paint suppliers.  This may indicate Sherwin-Williams' product failed at its intended use. Nonetheless, the sufficiency of a buyer's notice of

nonconformity to the seller is ordinarily a question of fact.
Id.

M&M Collision's difficulty with Sherwin-Williams' products
and its efforts to notify Sherwin-Williams of the nonconformity
and to rescind the Supply Agreement, coupled with the Ohio UCC's
good-faith requirements and command to construe the UCC's
remedies liberally, create genuine issues of material fact
regarding whether Sherwin-Williams failed to perform and provide
consideration for the Supply Agreement, and whether M&M
Collision was justified in rescinding or repudiating the
contract. Accordingly, Sherwin-Williams is not entitled to
summary judgment against M&M Collision on Count I and the Court
will deny its motion to that end.

## VI.  REMAINING CLAIMS AND PROCEDURAL POSTURE

With all pending motions now fully disposed, the operative
pleadings currently include: Sherwin-Williams' Amended
Complaint, ECF No. 72; M&M Collision's Answer to the Amended
Complaint (the Second M&M Collision Answer), ECF No. 96-5; and
Green and Coach Works' Amended Answer to the Amended Complaint
(the Second Green/Coach Works Answer), ECF No. 100-1. Still to
be resolved are: Count I against M&M Collision; Count III
against Green and M&M Collision; and Count IV against Green and
M&M Collision.

## VII. CONCLUSION

For the foregoing reasons, Sherwin-Williams' motion for default judgment will be denied; M&M Collision's motion to set aside default will be granted; Green and Coach Works' motion to file an amended answer will be granted; and Sherwin-Williams' motion for partial summary judgment will be granted in part and denied in part.  A separate order will issue.


                          _____/s/_____
                          William M. Nickerson
                          Senior United States District Judge

February 22, 2011